UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| CHRISTOPHER N. GANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:08-CV-175 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action was instituted by the Plaintiff pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the Plaintiff a period of disability, child's disability insurance benefits ("CIB"), and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, and 1382. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the disposition of Plaintiff's motion for judgment on the pleadings [Doc. 12] and Defendant's motion for summary judgment [Doc. 17].

For the reasons stated herein, I **RECOMMEND** that: (1) Plaintiff's motion for judgment on the pleadings [Doc. 12] be **DENIED**; (2) Defendant's motion for summary judgment [Doc. 17] be **GRANTED**; (3) the decision of Commissioner be **AFFIRMED**; and (4) this action be **DISMISSED**.

## Administrative Proceedings

Plaintiff filed an application for CIB on December 1, 2004, and December 20, 2005, and an application for SSI on September 1, 2004, alleging he became unable to work on July 1, 2004 (Tr.

94-95, 104-06, 452-55). After his applications were denied initially and on reconsideration (Tr. 22-26, 79-92, 440-51), Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 78). Following a hearing on June 14, 2007 (Tr. 462-73) and a supplemental hearing on October 30, 2007 (Tr. 456-61), the ALJ issued a decision on November 19, 2007 (Tr. 8-20), finding Plaintiff was not disabled. The decision of the ALJ became the final decision of the Commissioner on May 27, 2008, when the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 4-6).

## Standard of Review

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were unsupported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535,

2

548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir.

1986). The Court may consider any evidence in the record, regardless of whether it has been cited

by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of

Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d

at 388 (citation omitted).

### How Disability Benefits Are Determined

As noted, Plaintiff has filed an application for CIB and SSI. "Under Section 402(d) of Title

42 of the United States Code, a person is eligible for [CIB] if that person files an application, is

unmarried and under 18 years of age or suffers from a disability incurred before reaching age 22,

and was dependent upon an eligible wage-earner who died, became disabled, or was entitled to old

age insurance. *Houck v. Comm'r of Soc. Sec.*, 359 F. Supp. 2d 631, 631 (E.D. Mich. 2005) (citing

42 U.S.C. § 402(d)). The statutory standard for a determining disability for a CIB claim is the same

standard used in adult disability claims. *Sullivan v. Zebley*, 493 U.S. 521, 529 (1990) (citing 42

U.S.C. § 1382c(a)(3)(A) & (B)).[1]

The Sixth Circuit recently reiterated the five-step procedure used by the Social Security

Administration ("SSA") to determine eligibility for disability benefits as follows:

> The [Social Security] Act entitles to benefits payments certain
> claimants who, by virtue of a medically determinable physical or
> mental impairment of at least a year's expected duration, cannot
> engage in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A).
> Such claimants qualify as "disabled." *Id.* A claimant qualifies as

---

[1] In his decision, the ALJ found Plaintiff satisfied the non-disability requirements for CIB.
Neither Plaintiff nor the Commissioner has challenged these findings. Thus, the remaining issue in
this action is whether Plaintiff was disabled prior to age 22.

3

disabled if she cannot, in light of her age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). To identify claimants who satisfy this definition of disability, the SSA uses a five-step "sequential evaluation process." 20 C.F.R § 404.1520(a)(4). The five steps are as follows:

In step one, the SSA identifies claimants who "are doing substantial gainful activity" and concludes that these claimants are not disabled. *Id.* § 404.1520(a)(4)(i). If claimants get past this step, the SSA at step two considers the "medical severity" of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with impairments of insufficient duration are not disabled. *See id.* Those with impairments that have lasted or will last at least twelve months proceed to step three.

At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. *Id.* § 404.1520(a)(4)(iii), (d). The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *See Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

In the fourth step, the SSA evaluates claimants' "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled. *Id.* § 404.1520(a)(4)(iv), (f). "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past

4

relevant work. *See id.* § 404.1520(a)(4)(v), (g)(1). Claimants who can perform such work are not disabled. *See id.;* § 404.1560(c)(1). The SSA bears the burden of proof at step five. *See Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir.2003).

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).

## ALJ's Findings

The ALJ made the following findings in support of Commissioner's decision, which are conclusive if they are supported by substantial evidence in the record:

1.  The claimant meets the non-disability criteria for child's insurance benefits consideration, i.e., the claimant is the child of the wage earner, he was unmarried at the time application was filed and still unmarried, he was and is dependent on the wage earner, and he will not attained [sic] age 22 until August 15, 2008.

2.  The claimant has not engaged in substantial gainful activity since July 1, 2004, the alleged onset date . . . .

3.  The claimant has the following severe impairments: history of seizure disorder, chronic pain syndrome, fibromyalgia, history of migraine headaches, lupus, diabetes, history of asthma, and somatoform disorder . . . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . .

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of light and sedentary work, modified such that he must avoid pulmonary irritants, hazards, and he cannot climb ladders/ropes/scaffolds.

6.  The claimant has no past relevant work . . . .

7.  The claimant was born on August 15, 1986 and is 21-years old, which is defined as a younger individual age 18-49 . . . .

8.  The claimant has at least a high school education and is able to communicate in English . . . .

5

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work . . . .

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . .

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2004 through the date of this decision . . . .

(Tr. 13-14, 19-20).

## Issues

The issues presented by Plaintiff are whether the ALJ erred by failing to give appropriate weight to the medical opinion of Plaintiff's treating psychologist, Dr. Pendergrass, or by failing to find Plaintiff's residual functional capacity ("RFC") included mental limitations, particularly given the ALJ's finding of a "severe" mental impairment [Doc. 13 at 4].

## Review of Evidence

### *Plaintiff's Age, Education, and Past Work Experience*

Plaintiff was 20 years old at the time of the June 14, 2007 hearing and had a high school education with no past relevant work (Tr. 466-68).

### *Medical Evidence*

Only the most pertinent information will be briefly mentioned herein as it is not necessary to summarize all of the medical evidence, most of which is not in dispute. Whether or not the medical evidence is summarized herein, however, all of the relevant medical evidence has been reviewed and considered in reaching the recommendation set forth in this report and recommendation.

6

Carol Phillips, Ed. D, performed a consulting psychological evaluation of the Plaintiff for the state agency on June 21, 2005 (Tr. 269-72).  Plaintiff stated he suffered from lupus, seizures, Tourettes, attention deficit hyperactivity disorder ("ADHD"), asthma, gastrointestinal reflux disorder, diabetes and fibromyalgia (Tr. 269).  Plaintiff's parents accompanied him to the evaluation and they were both disabled and in motorized scooters (*id.*).  Plaintiff's mother described him as very disabled and Plaintiff reported he could not work because his parents needed him to help them due to their disabilities (*id.*).  Plaintiff reported all of his high school classes had been advanced placement classes (Tr. 270).  He also told Dr. Phillips he was in both the symphonic band and marching band at the University of Tennessee at Chattanooga ("UTC") (Tr. 270).  Plaintiff graduated high school in 2005 and had attended classes at UTC for two years, some on campus and some at the high school (*id.*).  Dr. Phillips described Plaintiff as oriented to time, place and person (Tr. 272).  He had good recall both recent and remote, his reasoning and judgment were adequate, and his mood and affect were congruent and appropriate (*id.*).  Although he had never worked, he volunteered at home games of the local minor league team (*id.*).  Plaintiff also planned to attend UTC full time beginning in August 2005 (*id.*).  Dr. Phillips' diagnostic impression was multiple medical complaints (*id.*).  She stated that Plaintiff's: (1) ability to understand and recall simple or complex work functions was not impaired; (2) ability to concentrate and be persistent for work tasks was unimpaired by psychological issues; (3) social interactive patterns were not impaired by psychological issues; and (4) adaption to changes and requirements in routine or work settings was not impaired by psychological factors (*id.*).

Frank Kupstas, Ph. D. completed a Psychiatric Review Technique Form ("PRTF") for the state agency on July 20, 2005 (Tr. 274-287).  He indicated Plaintiff had no medically determinable

mental impairment (Tr. 274).

Thomas M. Pendergrass, R.N., Ph.D. completed an information request for the state agency regarding Plaintiff on June 7, 2005 stating Plaintiff had not been seen in his office since March of 2000 and he had no current information on Plaintiff's status or functionality (Tr. 330). However, a letter from Dr. Pendergrass dated December 7, 2005, stated that Plaintiff had been under Dr. Pendergrass' care in recent months and had experienced significant pain associated with multiple medical problems (Tr. 333). Dr. Pendergrass stated that given the nature and extent of exacerbations over the last few months, Plaintiff has been unable to function adequately academically and socially secondary to his medical and psychological conditions (*id.*).

In a treatment note dated January 26, 2006, Dr. Pendergrass indicated Plaintiff had dropped out of classes at UTC due to his psychological and medical problems (Tr. 332). He indicated Plaintiff had a history of multiple medical and psychological challenges (*id.*). Dr. Pendergrass' diagnosis was ADHD, combined type (principal); Tourette's disorder (by history); mood disorder due to multiple general medical conditions (provisional); dependent personality features (provisional); multiple medical conditions; problems with primary support group: health problems in the family; educational problems; and academic problems (*id.*). Dr. Pendergrass also indicated Plaintiff's current global assessment of functioning ("GAF") was 60 (*id.*). Dr. Pendergrass indicated Plaintiff was experiencing anxiety and worry (3-Moderate), concern over physical health (4-Severe), difficulty organizing tasks and activities (3-Moderate), diminished interest in being with other people (3-Moderate), diminished need for sleep (3-Moderate), excessive distractibility (3-Moderate), impulsive responding (3-Moderate), impaired concentration (3-Moderate), irritable mood (3-Moderate), and somatic preoccupation (4-Severe).

8

In a clinical update dated August 16, 2006 (Tr. 335-36), Dr. Pendergrass indicated Plaintiff's current GAF was 50 (Tr. 335). He stated Plaintiff was well oriented in all spheres, although his level of consciousness appeared inattentive (Tr. 336). Plaintiff's recent memory appeared mildly impaired, but his remote memory was normal (*id.*). Plaintiff's judgment was fair, his concentration was characterized by a poor attention span; with regard to impulse control, Plaintiff showed poor planning (*id.*). Dr. Pendergrass completed an assessment of Plaintiff's mental limitations on August 29, 2006 (Tr. 327-29). Dr. Pendergrass indicated Plaintiff had a fair ability to perform activities of daily living independently and appropriately, free of supervision or direction and a fair ability to follow work rules and maintain personal appearance (Tr. 328). Dr. Pendergrass rated all other aspects of Plaintiff's mental functioning as poor (Tr. 327-29).

A diagnostic summary of psychotherapy from Dr. Pendergrass, which is dated June 10, 2007, indicated Plaintiff had been seen by Dr. Pendergrass for individual and family therapy, weekly to every other week since January 2006, and continued in therapy (Tr. 351). Dr. Pendergrass indicated the hallmarks of Plaintiff's case included severe medical problems and disability on the part of Plaintiff's parents, an overall chaotic family situation with other dysfunctional family members, minimization of the impact of psychological symptoms and the interaction of multiple medical providers and medications contributing to Plaintiff's overall symptom presentation and severity (*id.*). Dr. Pendergrass indicated a focus of Plaintiff's treatment had been family dysfunction; namely, that Plaintiff either assumed a caretaking role or a sick role depending on the family's overall level of functioning and had become isolated and increasingly anxious if out of contact with his parents (*id.*). Dr. Pendergrass' diagnosis was: somatoform disorder – undifferentiated; mood disorder secondary to general medical conditions; anxiety disorder not otherwise specified; ADHD, combined type;

9

Tourette's disorder (by history); dependent and avoidant personality features; multiple general medical conditions; problems with primary support group; individual and family health problems; academic/occupational problems; and financial problems (Tr. 351-52). Dr. Pendergrass indicated Plaintiff's current GAF was 45 (Tr. 352). Dr. Pendergrass stated that based upon clinical history, observation and psychological testing, Plaintiff demonstrated significant impairments in his overall level of emotional, social and occupational functioning and presented with a marked somatization disorder complicated by his overall level of depression and anxiety (Tr. 353). Dr. Pendergrass stated Plaintiff had significant cognitive difficulty due to marked problems with short term memory, language skills, attention and concentration and delayed memory (*id.*). Dr. Pendergrass also stated Plaintiff's activities of daily living were moderately impaired; his social functioning was markedly impaired; his concentration, pace and persistence in work or academic activities was markedly impaired; and Plaintiff was highly likely to experience episodes of decompensation and had a marked tendency to develop both psychological and physical symptoms in response to workplace stressors. (*id.*).

A letter from Joseph A. Motto, M.D. dated May 8, 2006, states Plaintiff had been under his care in recent months and had experienced significant pain associated with multiple medical problems (Tr. 323). Dr. Motto stated that given the nature and extent of exacerbations over the last few months, Plaintiff had been unable to function adequately academically and socially secondary to his medical and psychological conditions and was unable to work (*id.*).

A letter from the Office for Students With Disabilities at UTC, dated May 31, 2007, states Plaintiff was enrolled at UTC in the fall of 2005, but during his time at the university experienced a decline in his health and, as a result, medically withdrew from courses in the fall of 2005 due to

10

the impact of his physical and emotional health (Tr. 358).

*Hearing Testimony*

It is not necessary to summarize all of the hearing testimony, however, all of the testimony has been reviewed and considered in reaching the recommendation set forth in this report and recommendation.

At the initial hearing, Plaintiff testified he had a high school education, had never worked, and had been receiving various medical care (Tr. 467-69). Vocational expert Jane Colvin-Roberson (the "VE") testified at the October 30, 2007 supplemental hearing stating that based upon Dr. Pendergrass' assessment, Plaintiff would have a problem sustaining work (Tr. 458-49). She also testified Dr. Phillips' assessment would not preclude unskilled work (*id.*).

## Analysis

*Treating Physician Rule*

In evaluating Plaintiff's condition, the ALJ did not give controlling weight to the opinions of Plaintiff's treating psychologist, Dr. Pendergrass. Plaintiff asserts the ALJ did not give appropriate weight to Dr. Pendergrass' opinion [Doc. 13 at 5]. Plaintiff notes that during the supplemental hearing, the VE testified that if the limitations set forth in Dr. Pendergrass' August 2006 assessment were fully credited, Plaintiff would have a problem sustaining work [*id.*]. Plaintiff asserts Dr. Pendergrass' treating opinion is entitled to controlling weight because Dr. Pendergrass' ongoing treatment relationship with Plaintiff offers an explanation for his worsening condition, which is documented by the decrease in Plaintiff's GAF [*id.* at 7]. Plaintiff asserts Dr. Pendergrass' reports show he has an intimate knowledge of Plaintiff's mental heath condition and Dr. Pendergrass' most recent report is bolstered by the results of a battery of clinical psychological

testing of Plaintiff [*id.*].

The ALJ explained his findings concerning the medical source opinions stating:

> In assessing the claimant's mental health impairments, I am aided by the fact he was seen for an impartial consultative psychological evaluation, on June 21, 2005, performed by Dr. Carol Phillips, a licensed psychologist. I note this evaluation occurred approximately 1 year after the claimant alleges disability commenced. Dr. Phillips noted the claimant was accompanied by both parents who presented in power scooters and were reportedly disabled. The claimant's mother reported he [claimant] was very, very disabled. Dr. Phillips noted the claimant, on entering her office stated " . . . the government gives me a little check every month (child's benefits on disabled father's earnings record) . . . since I was a little child." She further noted the claimant was not really sure what [sic] he got the check but perhaps it was because of his parent's disability. In any event, the claimant reported he could not work because of his parent's disabilities and their need from him of help. The claimant reported a multitude of impairments . . . . The claimant stated during high school he attended all classes in the "advanced placement" category. Dr. Phillips noted these classes were typically for students who excelled in classes and prepared them for college. AP classes are taught at a higher level than normal high school classes and, according to the consultative examiner, are as challenging as freshman level college classes. . . The claimant reported he had studied at least two years at the University and had obtained a scholarship to pay his tuition. He added that he completed a pre-calculus classes [sic] in three weeks instead of the 8-weeks which it usually took. When discussing his own work history, the claimant noted he had difficulty "working since my parents are both disabled and I have to do a lot of things for them." The claimant reported volunteering for home games at the Chattanooga Lookout games, performing various duties as assigned. He noted that he had volunteered for three summers. The claimant reported no history of mental health treatment or intervention . . . . After evaluating the claimant and administering intelligence tests, Dr. Phillips concluded the claimant's ability to recall simple or complex work functions was not impaired, his ability to concentrate and be persistent for work tasks was not impaired; social interactive patterns were not impaired; and the claimant's ability to adapt to changes was not impaired. Dr. Phillips opined the claimant did not experience a severe mental-health impairment.
> . . .

12

Several months after the consultative psychological evaluation, Dr. Thomas M. Pendergrass, a psychologist who had treated the claimant when he [was] much younger for ADHA (treatment ended in March 2000) began counseling the claimant. On December 7, 2005, Dr. Pendergrass submitted correspondence, noting the claimant's pain and behavior problems such as his history of ADHD, Tourettes, significant periods of depression, and intermittent problems with complex cognitive function. The correspondence was intended to support the claimant's application for withdrawal from college which was granted. The medical record shows Dr. Pendergrass actually first examined the claimant on January 26, 2006. After evaluating the claimant, Dr. Pendergrass reported his global assessment of functioning measure was 60, evidencing "moderate" symptoms. . . The next instance of counseling evidenced before me is August 16, 2006 followed by a session on August 29, 2006. Dr. Pendergrass submitted an assessment, dated August 29, 2006, concluding the claimant had a "poor" ability to perform practically all mental requisites of work activity. He further submitted a summary, dated June 10, 2007, stating the claimant had participated in family and individual therapy weekly since January 2006. In this summary, Dr. Pendergrass concluded the claimant was "markedly" impaired and would decompensate if confronted by workplace stressors.
. . .

Although I have considered Dr. Pendergrass' opinion carefully since he is the treating source, I do not find his opinion well supported. First, Dr. Pendergrass' frequency of reported treatment is not corroborated by treatment records; although the claimant reportedly sees him frequently, the claimant's global assessment of functioning has reportedly went down from 60 to 45; the claimant has not been referred or treated by a psychiatrist; he has not required inpatient mental health treatment; and most importantly, Dr. Pendergrass' assessment is almost totally inconsistent with Dr. Phillips' opinion and the claimant's acknowledged academic background, hobbies, and activities of daily living which include caring for two parents who are disabled. Therefore, I have not assigned considerable weight to Dr. Pendergrass' opinion.

(Tr. 16-18) (internal citations omitted) (emphasis in original).

Applicable regulations state the Commissioner will evaluate every medical opinion and will consider the following factors in deciding what weight to give each opinion: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. 20 C.F.R. §§

13

404.1527(d), 416.927(d). Although a treating physician's opinion typically is entitled to substantial deference, as argued by Plaintiff, the ALJ is not bound by that opinion. *Warner*, 375 F.3d at 390; 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). The Sixth Circuit has consistently stated the treating source's opinion is entitled to deference only if it is based on objective medical findings, *see, e.g.*, *Warner*, 375 F.3d at 390; *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993), *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985), and not contradicted by substantial evidence to the contrary. *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987).

If the treating source's opinion is not given controlling weight, its weight is determined by the same factors that are considered in evaluating every medical opinion. It is well-settled law in the Sixth Circuit that if an ALJ does not accord controlling weight to the opinion of a claimant's treating source, the ALJ must apply certain factors in determining what weight to give the opinion. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). Pursuant to the regulations, the ALJ:

> is to consider (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, and (5) the specialization of the treating source.

*Id.* (quoting 20 C.F.R. § 404.1527(d)).

The ALJ must weigh the opinions of the acceptable medical sources, including the opinions of the treating physicians and the state agency medical sources, as required by applicable regulations, and resolve inconsistencies between the acceptable sources. 20 C.F.R. §§ 404.1527(d)(4), (f)(2)(i) and 416.927(d)(4), (f)(2)(i). The responsibility for weighing the record evidence, including conflicting physicians' opinions, and resolving the conflicts rests with the ALJ.

14

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

In addition, the ALJ must give good reasons for the weight given a treating source's opinion.

*Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 461 (6th Cir. 2005); 20 C.F.R. § 404.1527(d)(2)).

This reason-giving requirement is "clearly procedural ensuring 'that the ALJ applies the treating

physician rule and permits meaningful review of the ALJ's application of the rule.'" *Smith v.

Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (quoting *Wilson*, 378 F.3d at 544). The

reason-giving requirement in § 404.1527(d)(2) "exists, in part, for claimants to understand why the

administrative bureaucracy deems them not disabled when physicians are telling them that they are."

*Id.* In the Sixth Circuit:

> [b]ecause of the significance of the notice requirement in ensuring
> that each denied claimant receives fair process, a failure to follow the
> procedural requirement of identifying the reasons for discounting the
> opinions and for explaining precisely how those reasons affected the
> weight accorded the opinions, denotes a lack of substantial evidence,
> even where the conclusion of the ALJ may be justified based upon
> the record.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

Contrary to Plaintiff's assertions, the ALJ followed the appropriate steps and the reason-

giving requirement in deciding not to give controlling weight to the opinion of Dr. Pendergrass. The

ALJ acknowledged Dr. Pendergrass was a treating source. The ALJ noted, however, that although

Dr. Pendergrass indicated in his June 2007 diagnostic summary of psychotherapy he saw Plaintiff

weekly or every other week, the medical evidence of record did not support such frequency of

treatment as the record contained treatment notes from Dr. Pendergrass on January 26, 2006 and a

clinical update dated August 16, 2006, in addition to the June 10, 2007 diagnostic summary. The

ALJ also noted the weight to be accorded Dr. Pendergrass' assessment was adversely affected by

the fact that on December 7, 2005, Dr. Pendergrass wrote a letter, for the purpose of supporting Plaintiff's withdrawal from UTC, which indicated Plaintiff had been under Dr. Pendergrass' care in recent months, when other evidence of record showed Dr. Pendergrass did not see Plaintiff for treatment from March of 2000 until January 2006. The ALJ also noted Dr. Pendergrass' assessment differed significantly from the results of Dr. Phillips' June 21, 2005 consulting psychological evaluation of Plaintiff, which was performed nearly a year after Plaintiff's alleged onset of disability and did not result in the diagnosis of any significant mental impairment (Tr. 272). In addition, Dr. Pendergrass indicated Plaintiff had a long history of impaired attention and concentration and a trend of developing increased symptoms in response to stressors (Tr. 327), but this statement appears to be inconsistent with treatment notes indicating Dr. Pendergrass had not seen Plaintiff from March 2000 until January 2006. Moreover, Dr. Phillips who examined Plaintiff in June 2005, found no symptoms indicative of impaired attention and concentration.

Further, the ALJ also found the severity of Dr. Pendergrass' assessment was inconsistent with Plaintiff's own reported activities of daily living, including his academic success, hobbies, and caring for two disabled parents. The ALJ also found Plaintiff's subjective complaints were not fully credible. Plaintiff has not challenged the ALJ's credibility finding in this action and, thus, has waived review of it. *Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 884 (6th Cir. 2003). To the extent that Dr. Pendergrass' assessment is based upon his fully crediting Plaintiff's self-reports of psychological symptoms, this would also undercut the weight to be accorded to Dr. Pendergrass' assessment.

Accordingly, I **FIND** the ALJ gave good reasons for not according controlling weight to Dr. Pendergrass' assessment of Plaintiff and the ALJ's decision with respect to Dr. Pendergrass' opinion

is supported by substantial evidence in the record.

*Lack of Specific Mental Limitations*

Plaintiff notes that at step two of the sequential evaluation, the ALJ found his severe impairments included a somatoform disorder and also found Plaintiff would have mild difficulty in maintaining social interaction and moderate difficulty in his ability to maintain concentration, persistence and pace. Plaintiff asserts that despite the aforementioned findings, the ALJ erred in finding Plaintiff's "work-related functioning is impaired by his somatoform disorder, but [in] failing to translate this impairment into specific work-related limitations." [Doc. 13 at 9].

In his decision, the ALJ found Plaintiff's "severe" impairments included a somatoform disorder – a mental impairment (Tr. 13), but further stated:

> Guidance in the evaluation of mental impairments and their impact on an individual's ability to perform work activity is provided in the Regulations at 20 C.F.R. §§ 404.1520a and 416.920a. A special procedure describes diagnostic criteria for eight categories of listed mental impairments. Then, once the diagnostic criteria are satisfied for an impairment (s), the "B" and/or "C" criteria are used to rate impairment severity. The claimant's mental impairments appear to meet the diagnostic, or "A" criteria of listings 12.07.
>
> Under the "B," or functional criteria of these listings, I find the claimant's impairment imposes only a mild difficulty completing daily activities and maintaining appropriate social interaction. I find the claimant's mental impairment causes only a moderate difficulty in his ability to maintain concentration, persistence, and pace. A "marked" limitation in the claimant's ability to concentrate is inconsistent with his academic achievements and hobbies including participating in a college band. *The claimant's limitations would reasonably limit him to the performance of unskilled work activity.* There is no indication of episodes of deterioration or decompensation in a work or work-like setting.
>
> As with exertional capacity, <u>Social Security Ruling 96-8p</u> requires a claimant's non-exertional capacity be expressed in terms of work-related functions. *The claimant has non-exertional limitations,*

> *primarily as a result of [a] somatoform disorder, which restrict him to unskilled work activity.* Specifically, my review of the record reveals no significant deficiency in the claimant's capacity to perform the work-related mental activities generally required by competitive, remunerative work, i.e., the abilities to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, coworkers, and work situations; and deal with changes in a routine work setting.
> . . .
> The claimant has limitations, primarily as a result of his history of seizure disorder, chronic pain syndrome, fibromyalgia, history or migraine headaches, lupus, and diabetes, which restrict him to light and sedentary work. I also find he cannot climb ladders/ropes/scaffolds, must avoid pulmonary irritants (childhood history of asthma) and should avoid hazards e.g., dangerous machinery and heights (history of seizures).
> . . .
> Based on a residual functional capacity for the full range of light and sedentary work, considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.20 and 201.27. I do not find the claimant's need to avoid pulmonary irritants, hazards, or his inability to climb ropes/ladders/scaffolds substantially erodes the occupational base administratively noticed in the Medical-Vocational Guidelines. In fact, SSR's 83-12 and 96-9p specifically provide these restrictions do not significantly erode the sedentary occupational base.

(Tr. 18-20) (emphasis added).

Although Plaintiff asserts the ALJ erred in not imposing any additional limitations to his RFC based upon his somatoform disorder, it is the functional limitations imposed by a condition, not just a diagnosis of the condition, that determines disability. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (per curiam) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) (a claimant diagnosed with dysthymic disorder must nevertheless establish that the condition was disabling); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir.), *cert. denied*, 389 U.S. 1060 (1967) (the fact that a person suffers from a diagnosed disease or ailment is insufficient absent proof the condition is severe

18

enough to be disabling, to warrant an award of benefits).

In this case, the ALJ did not include any specific mental limitations in his finding Plaintiff had the RFC to perform the full range of light and sedentary work, modified such that he must avoid pulmonary irritants, hazards, and could not climb ladders, ropes and scaffolds (Tr. 14). Plaintiff notes this is inconsistent with the ALJ's statement that Plaintiff had nonexertional limitations, mainly as the result of his somatoform disorder, which restricted him to unskilled work activity. (Tr. 18). Contrary to Plaintiff's assertion, however, the ALJ did not find that Plaintiff's somatoform disorder did not impose any mental limitations. Instead, the ALJ found Plaintiff's somatoform disorder would restrict him to unskilled work, and that Plaintiff had "no significant deficiency to perform work-related mental activity . . ., i.e., the abilities to understand, carry out, and remember instructions, use judgment in making work-related decisions; respond appropriately to supervision, coworkers, and work situations; and deal with changes in a routine work setting. . . ." (Tr. 18-19).

Moreover, in finding Plaintiff not disabled, the ALJ relied on the medical-vocational guidelines or "grids," specifically, Rules 202.20 and 201.27 (Tr. 18-19). The Commissioner can meet his burden of showing the Plaintiff can do work which exists in significant numbers by relying on the grids. *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where a plaintiff's characteristics fit the grids, testimony by a vocational expert is not necessary to show a significant number of jobs exist in the economy that the plaintiff can perform given his RFC, as the grids take the availability of jobs into account. *Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 922 (6th Cir. 1987) (per curiam). The grids are only applicable, however, when all factors coincide with the elements in the grid. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The grids also are not fully applicable if the plaintiff

suffers from a significant non-exertional impairment. *Damron v. Sec'y of Health and Human Servs.*, 778 F.2d 279, 282 (6th Cir. 1985). Non-exertional limitations must be taken into account and the grids cannot be used only if non-exertional limitations restrict a plaintiff's performance to less than the full range of work at his or her RFC. *Kirk*, 667 F.2d at 528-29.

If the Commissioner cannot rely on the grids to meet this burden, a vocational expert may testify as to the availability of jobs which a claimant can perform. *See Born v. Sec'y of Health and Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990). The testimony of the vocational expert can constitute substantial evidence to support the ALJ's finding that the plaintiff retains the RFC to perform a significant number of jobs existing in the regional and national economy, but only if the hypothetical question accurately portrays the plaintiff's physical and/or mental impairments. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002); *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *Bradford v. Sec'y of Dep't of Health and Human Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) (per curiam).

Despite finding Plaintiff's somatoform disorder restricted him to the performance of unskilled work, the ALJ did not err in relying on the grids to determine Plaintiff was not disabled. The commentary to the grids, Rule 201.00, which deals with Rules 201.01 through 201.29, states:

> Maximum sustained work capability limited to sedentary work as a result of severe medically determinable impairment(s). (a) . . . Approximately 200 separate unskilled sedentary occupations can be identified, each representing numerous jobs in the national economy. . . . These jobs (unskilled sedentary occupations) may be performed after a short demonstration or within 30 days.

20 C.F.R. pt. 404, subpt. P, app. 2, 201.00

Similarly, the commentary to Rule 202.00, which deals with Rules 202.01 through 202.22, states:

20

> Maximum sustained work capability limited to light work as a result of severe medically determinable impairment(s). (a) The functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work. Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy.

20 C.F.R. pt. 404, subpt. P, app. 2, 202.00.

Social Security Ruling ("SSR") 85-15 which addresses the grid rules states:

> The Medical-Vocational Guidelines (Regulations No. 4, Subpart P, Appendix 2) discusses the relative adjudicative weights which are assigned to a person's age, education, and work experience. Three tables in Appendix 2 illustrate the interaction of these vocational factors with his or her RFC. RFC is expressed in terms of sedentary, light and medium work exertion. The table rules reflect the potential occupational base of unskilled jobs for individuals who have severe impairments which limit their exertional capacities: approximately 2,500 medium, light, and sedentary occupations; 1,600 light and sedentary occupations; and 200 sedentary occupations – each occupation representing numerous jobs in the national economy.

SSR 85-15, 1985 WL 56857 at *1.

In *Rawlins v. Astrue*, No. CIV.A.5:07CV-162-J, 2008 WL 2387704 (W.D. Ky. Jun 11, 2008), the ALJ found that the plaintiff suffered from a "severe" bipolar disorder that limited her to simple, unskilled work activity. *Id.* at *5. The plaintiff asserted the ALJ erred in relying on the grid rules, specifically grid rules 202.10 and 202.17, because the limitation to unskilled work activity "constitute[d] a non-exertional limitation that would be expected to erode the occupational base" described in the grid rules. *Id.* The court found the plaintiff's argument "unpersuasive because the cited Rules implicitly contemplate the non-exertional limitation found by the ALJ of being limited to unskilled work inasmuch as they contemplate an individual whose previous work experience was 'unskilled or none.'" *Id.*

21

In another case, *Allison v. Apfel*, No. 99-4090, 2000 WL 1276950 (6th Cir. Aug. 30, 2000), the plaintiff challenged the ALJ's decision asserting that because the ALJ found he suffered from nonexertional impairments, the ALJ improperly relied on the grids. *Id.* at *2. The Sixth Circuit rejected the plaintiff's argument, stating:

> the ALJ noted the [plaintiff] retains the capacity "to perform a broad range of unskilled work at both the sedentary and light levels of exertion." Because [plaintiff's] nonexertional impairments only limited him to unskilled light work, the ALJ was correct to conclude that there remained a significant number of jobs in the economy that [plaintiff] could perform, since "[a]pproximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy." 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.00(a).

*Id.* at *4.

Finally, in *Dollins v. Astrue*, CIV. No. 08-141-KSF, 2008 WL 4402208, *2 (E.D. Ky. Sep. 24, 2008), the ALJ found the plaintiff retained the RFC to perform simple, unskilled, entry level work that allows for low stress work without public contact or significant interaction with others; and, using the grids, the ALJ found the plaintiff was not disabled. *Id.* at *2. On appeal, the plaintiff asserted, *inter alia*, the ALJ erred in relying in the grids and in failing to obtain a vocational expert's testimony at the fifth step of the sequential evaluation. *Id.* at *4. The court disagreed stating:

> the rules of the Grids take administrative notice of the numbers of unskilled jobs at various exertional levels that exist throughout the national economy. . . . a limitation to simple, unskilled, entry level work that allows for less stress work without public contact or significant interaction with others would not significantly erode the occupational base represented by the Grids. In other words, because [plaintiff's] RFC does not include any exertional limitations, his occupational base includes *all* of the unskilled jobs recognized by the Grids. [Plaintiff's] mental impairments do not significantly affect his ability to perform a full range of work, therefore, the ALJ is not precluded from using the Grids.

22

*Id.* at *4 (emphasis in original) (citations omitted).

Here, the ALJ properly found Plaintiff's mental impairment limited him to unskilled work and that his physical RFC, considered in conjunction with his mental RFC, did not preclude Plaintiff from engaging in the full range of unskilled light and sedentary work activity.[2] The ALJ then properly applied the grids to determine Plaintiff was not disabled as there were a significant number of unskilled light and sedentary job the Plaintiff could perform in the national economy given his RFC.

Having reviewed the administrative record in light of the specific assertions of error asserted by Plaintiff, I **CONCLUDE** the decision of the Commissioner denying CIB and SSI benefits to Plaintiff is supported by substantial evidence in the record and, therefore, should be affirmed.

## Conclusion

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, for the reasons stated above it is **RECOMMENDED**[3]:

    (1)    Plaintiff's motion for judgment on the pleadings [Doc. 12] be **DENIED**;

    (2)    Defendant's motion for summary judgment [Doc. 17] be **GRANTED**;

---

[2] Plaintiff has not challenged the ALJ's finding as to his physical RFC and, thus, has waived review of that issue. *Yamin*, 67 F. App'x at 884.

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

(3)     Judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure

        **AFFIRMING** the Commissioner's decision which denied benefits to the Plaintiff;

        and

(4)     This action be **DISMISSED**.


                                        s/*Susan K. Lee*_____
                                        SUSAN K. LEE
                                        UNITED STATES MAGISTRATE JUDGE